IN THE MATTER OF STREAM ENCROACHMENT
PERMIT NO. 12400.

IN THE MATTER OF THE APPROVAL OF THE TEMPORARY
SOLID WASTE FACILITY PERMIT, NJPDES PERMIT NO.
NJ0061492, PERMIT TO CONSTRUCT, ETC., EQUIPMENT, PRE-
VENTION OF SIGNIFICANT DETERIORATION PERMIT, AND
ENVIRONMENTAL AND HEALTH IMPACT STATEMENT AP-
PROVAL FOR THE BERGEN COUNTY RESOURCE RECOV-
ERY FACILITY.

Superior Court of New Jersey
Appellate Division

Argued November 28, 1988—Decided January 5, 1989.

Before Judges PETRELLA, SHEBELL and GRUCCIO.

*Timothy S. Haley* argued the cause for appellant Borough of Ridgefield (*Gordon, Gordon & Haley,* attorneys; *Michael Gordon* and *Stefanie A. Brand* on the brief).

*Michael S. Caro,* Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (*W. Cary Edwards,* Attorney General, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel; *Michael S. Caro* on the brief).

*Stephen P. Sinisi* argued the cause for respondent Bergen County Utility Authority (*Demetrakis, Sinisi & Carmel,* attorneys; *Stephen P. Sinisi* and *Roberta S. Weisinger* on the brief).

*Mark A. Chertok* of the New York Bar, admitted pro hac vice, argued the cause for respondent American Ref–Fuel Co.

of Bergen County (*Cecchi, Brody & Agnello,* attorneys; *Mark A. Chertok* and *Karen E. Gross* on the brief).

PER CURIAM.

The Borough of Ridgefield appeals in these consolidated matters from the issuance of various permits to American Ref–Fuel of Bergen County, including a stream encroachment permit, a temporary solid waste facility permit and other related permits with regard to the proposed construction of a resource recovery facility for Bergen County, in Ridgefield. The site for the facility was designated by the Bergen County Utilities Authority (Utilities Authority) and approved by the county after the Hackensack Meadowlands Development Commission (the HMDC) and the Utilities Authority determined that it was the best available alternative site. Ridgefield separately appealed the issuance of the stream encroachment permit and the temporary solid waste facility permit. The two appeals have been consolidated.

Approximately 72 acres of vacant land in Ridgefield were designated as the proposed site for the development and construction of a resource recovery facility. The site selection process has been going on since at least 1984 when the Utilities Authority selected American Ref–Fuel Company of Bergen County (American Ref–Fuel) to design, construct and operate the resource recovery facility for a period of 25 years. A January 15, 1985 service agreement between the Utilities Authority and American Ref–Fuel incorporated those aspects and required the latter to obtain all permits and licenses to operate the facility. It was contemplated that the site would be owned by the Utilities Authority and leased to American Ref–Fuel.

During the summer and fall of 1985 the Utilities Authority submitted a draft Environmental and Health Impact Statement. On July 27, 1985 American Ref–Fuel applied to the State Department of Environmental Protection (DEP) for a certificate

of approved registration and engineering design as required by the Solid Waste Management Act (*N.J.S.A.* 13:1E–1 *et seq.*), a permit to construct, install or alter control apparatus or equipment, and a prevention of significant deterioration permit (air pollution control permit).

American Ref–Fuel submitted an application on October 8, 1985 for a New Jersey Pollution Discharge Elimination System/Discharge permit (NJPDES permit). On October 22, 1985 it also applied to the DEP for a stream encroachment permit (number 12400) to place fill and construct certain structures on the proposed site.

On May 7, 1986, the DEP issued stream encroachment permit number 12400, effective June 6, 1986, and containing specified terms and conditions. Ridgefield filed its notice of appeal and challenged the permit on the basis that no required findings were made by the DEP for its issuance.[1] On November 2, 1987 the DEP issued a new stream encroachment permit to American Ref–Fuel bearing the same number. Ridgefield filed an amended notice of appeal challenging this November 2, 1987 permit.

In the meantime, the DEP held a public hearing on December 18, 1986 for consideration of the application for a solid waste facility permit, air control permit and NJPDES permit. Comments were solicited by the DEP through January 17, 1987. The DEP approved the remaining permits sought by American Ref–Fuel on November 23 and 24, 1987. These permits included a temporary solid waste recovery permit, a NJPDES permit and an air pollution control permit. The Environmental and Health Impact Statement was also approved at this time. Ridgefield filed a notice of appeal on December 18, 1987 chal-

---

[1]Subsequently, the permit appeal was remanded to allow the DEP to complete additional review and make further findings. This remand was authorized by an April 9, 1988 order.

lenging the issuance of this set of permits.[2] Both appeals were consolidated on February 23, 1988.

I

None of the parties to this appeal dispute the existence of the increasing solid waste disposal crisis in Bergen County, the State and indeed the northeastern part of the country. The problem is not recent in New Jersey. The 1970 enactment of the Solid Waste Management Act (*N.J.S.A.* 13:1E–1 to 15) and the Solid Waste Utility Control Act (*N.J.S.A.* 48:13A–1 to 13), represented the culmination of years of growing concern over garbage siting problems as well as increasing costs of collection, disposal and regulation. 1975 amendments to the Solid Waste Management Act further addressed the problem. Under the 1970 legislation the Hackensack Meadowlands District and each of the State's 21 counties were designated as solid waste management districts with the responsibility for preparing a Comprehensive Solid Waste Management Plan to deal with the problem in their respective districts. See *N.J.S.A.* 13:1E–2b(2); *N.J.S.A.* 13:1E–19 to 24.

Resource recovery and recycling has been encouraged by the Legislature in order to relieve the burden on landfills which have reached and exceeded their maximum capacity. See *N.J. S.A.* 13:1E–2b(7); *Clean Capital County Committee v. Driver,* 228 *N.J.Super.* 506 (App.Div.1988). In 1985 *N.J.S.A.* 13:1E–136 was enacted as an amendment to the Solid Waste Management Act and sets forth as a state policy:

... New Jersey must move away from its current reliance on landfilling as the principal method of solid waste disposal to the application of waste reduction, recycling, and energy recovery technologies.

The record before us demonstrates that pursuant to the statutory requirements Bergen County, one of the 22 designat-

---

[2]In its brief Ridgefield disputes only the issuance of the temporary solid waste recovery and air pollution control permits. Hence, any challenge to the other permits issued in November 1987 are considered abandoned.

ed solid waste management districts, in conjunction with the Utilities Authority, undertook investigations to identify a suitable site for a proposed resource recovery facility. Although 76 parcels of property within the county were identified as potential sites, 67 were eliminated from consideration because of environmental factors. After comparative evaluation the Ridgefield site was found to be the best of the nine remaining proposed sites. The Ridgefield site, bounded by Conrail Freight Yards and the Public Service Electric and Gas Company generating station to the north, the New Jersey Turnpike to the east and south and the Utilities Authority's sewage treatment plant to the west, had previously been used as a dredge soil disposal site. There are no residences within a half mile. The entire Ridgefield site area was filled in in the late 1960s and early 1970s with soil excavated during the construction of the Vince Lombardi service area of the New Jersey Turnpike to an elevation of six to eight feet above mean sea level.

In 1979 the adopted Bergen County Solid Waste Management Plan designated the Ridgefield site for use as a resource recovery facility. The DEP approved that plan on May 1, 1980. Thereafter, the Bergen County Board of Chosen Freeholders adopted a resolution on December 30, 1980 which designated the Utilities Authority as the agency to implement the county's plan.

The proposed resource recovery facility would generate high pressure steam from the incineration of waste from Bergen County municipalities and selected dry industrial waste generated within the county. The generated steam is proposed to be utilized to produce electricity for sale to Jersey Central Power and Light Company and transmitted across Public Service Electric and Gas Company lines to the Jersey Central Power Grid System. Operation of the facility would also produce waste water discharges, air emissions and ash residue. The waste water is planned to be treated at the Utilities Authority's plant in Little Ferry and the ash residue would be temporarily stored and then sold as ferrous metal to the secondary materials

market. A site in North Arlington has been designated as the repository for the ash residue.

The HMDC had also contemporaneously investigated resource recovery sites since it had responsibility to provide sufficient solid waste disposal facilities for municipalities who disposed of their waste within the district. It considered approximately 30 vacant parcels of land within the district which were identified and evaluated as a potential resource recovery system site. Consideration was narrowed to eight sites for detailed study of land use, site access and environmental features. Five of these sites were selected by the HMDC for further consideration, including sites in the Borough of Teterboro and Ridgefield. A 1975 Rutgers University study had recommended these two Bergen County sites as more suitable than the three other potential sites located in the district but outside of Bergen County. However, the Teterboro site was developed in 1976, rendering it economically unavailable for development as a resource recovery facility. The Ridgefield site thus became the preferred location to serve both Bergen County and the Hackensack Meadowlands District. The HMDC also identified Ridgefield as the site for such a facility in its proposed Solid Waste Management Plan dated July 1, 1978, which was approved by the DEP on October 1, 1979. The Utilities Authority argues that Ridgefield never challenged its designation as the preferred site in either the county or HMDC plan and thus it is too late to now challenge the designation.

The HMDC and Bergen County jointly applied to the United States Environmental Protection Agency (EPA) for funding to complete the planning and design of a 3,000 ton per day resource recovery facility at the Ridgefield site.

The Utilities Authority conducted a further study in 1983 in an effort to identify viable alternative facility sites because the Ridgefield site contained wetlands and such a study was required because an Army Corps of Engineers permit was required pursuant to section 404 of the federal Clean Water Act

(33 *U.S.C.* § 1344). It was necessary to perform this additional site selection study to determine the availability of alternative upland sites. The screening criteria of a parcel size greater than 45 acres and present vacant land use were utilized. This resulted in a site in Lyndhurst, located on a previously land-filled area, being selected. The site was within the district and had been zoned residential by the HMDC. Ultimately it was determined that the site was not available because the zoning could not be changed and moreover approximately 1.3 million cubic yards of solid waste would have to be removed prior to construction. There was a likelihood that some of the waste could be toxic while no place for safe disposal of that waste existed.

Ridgefield appealed the HMDC's denial, after public hearings, of the Utilities Authority's request for a zoning change on the Lyndhurst site. That determination was upheld on appeal in *Mayor and Council of the Boro. of Ridgefield v. Hackensack Meadowlands Development Commission*, Docket No. A-3747-84 (decided December 26, 1985). The Utilities Authority later conducted further site selection review and evaluation studies which concluded, despite the study of some 81 potential sites, that there was no feasible alternative outside of the Ridgefield site. The Utilities Authority then selected American Ref-Fuel to construct and operate the resource recovery facility and issued $183,300,000 in Solid Waste Resource Recovery Revenue Variable Rate Demand Bonds, Series A, contemporaneously and on a parity basis with its Series B bonds valued at $183,500,000. Subsequently, the Utilities Authority entered into the above-mentioned service agreement with American Ref-Fuel. The HMDC rezoned the Ridgefield site from marshland preservation to heavy industrial to make it consistent with the proposed use.

Upon receipt of the draft Environmental and Health Impact Statement and the permit applications the DEP identified the project as one involving "special concerns." Thus, compliance with *N.J.A.C.* 7:13–5.4 was required. The DEP questioned the

site selection process and the need for over 45 acres for a potential site when only 20 acres was needed to construct the facility. The Utilities Authority and American Ref–Fuel justified the additional acreage as a needed buffer for the facility.

The DEP approved the stream encroachment permit application on May 7, 1986, and after the appeal previously mentioned was remanded, additional documentation was submitted by American Ref–Fuel to supplement the record. The facility layout was modified to minimize wetlands disturbance and a mitigation plan was proposed which provided for enhancement and creation of approximately 36 acres of wetlands as compensation for encroachment on 14.1 acres of low quality wetlands on the facility site. The result was a 1.4 to 1 replacement of habitat loss. About the same time Bergen County amended its Solid Waste Management Plan to designate a North Arlington landfill site as a potential residuals disposal site to serve the Ridgefield recovery facility.

 Ridgefield argues that the DEP's issuance of a stream encroachment permit violated *N.J.A.C.* 7:13–5.4(a) governing permits for "Projects of Special Concern" since feasible alternatives to the Ridgefield site exist.[3] The cited regulation defines "Projects of Special Concern" as:

stream encroachment projects which, because of their potentially serious adverse effects, will not be approved unless denial of the application would damage the public interest, cause hardship to the applicant, or produce costs disproportionately larger relative to the adverse effects of the project. [*N.J.A. C.* 7:13–5.1(b)].

Before stream encroachment permits for "Projects of Special Concern" will be issued the DEP must determine that:

1. There is no feasible and prudent alternative including the no action alternative, which would avoid, or substantially reduce, the hydraulic, environ-

---

[3]Although an alternate site might obviate the need for a stream encroachment permit it is not disclosed whether any of the other suggested alternative sites would not require stream encroachment permits. Most meadowland sites in the HMDC district may involve present or former water areas.

mental or other damage, and which is consistent with the reasonable requirements of the public health, safety, and welfare; or

2. Denial of the permit would create an exceptional and undue hardship upon the applicant; or

3. There is an unreasonably disproportionate relationship between the hydraulic, environmental or other damage of the proposal and the added cost of avoiding or mitigating such damage. [*N.J.A.C.* 7:13–5.4(a)].

In addition to satisfying the DEP that there were no feasible and prudent alternatives, the Utilities Authority and American Ref–Fuel were required, in connection with its application to the Army Corps of Engineers for a permit to fill wetlands (see 33 *U.S.C.* § 1344), to establish that no alternative "practicable"[4] sites were available. 40 *C.F.R.* 230.10. DEP regulations do not define "feasible and prudent alternative." However, we consider that the criteria in *N.J.A.C.* 7:13–5.4 is essentially the same as under the federal regulations.

Ridgefield argues that Lyndhurst was and still should be considered a feasible alternative site. The Lyndhurst site was eliminated from consideration because the HMDC denied the request of the Utilities Authority for a zoning change. That decision was upheld by this court. We reject Ridgefield's argument that the HMDC zoning should be considered on the same level as municipal zoning. The district is a state agency and, as previously noted, was constituted a separate solid waste management district.

We also reject Ridgefield's argument that a 45 acre or larger site was not required so that smaller alternative sites were available in other locations. As noted, the 45 acre area was deemed necessary to provide an adequate buffer for the facility. Notwithstanding that, an additional site selection study was undertaken in April 1986 examining areas under 45 acres. Each site identified was found not to be potentially feasible. Ridgefield claims that at least three alternative sites were

---

[4]Practicable alternative under 40 *C.F.R.* 230.10(a)(2) is one "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of the overall project purposes."

identified in the residual landfill siting study. They were located in North Arlington (chosen as the residual ash site); Lyndhurst, a site previously decided to be unfeasible; and Rutherford (zoned residential by the HMDC). The Lyndhurst and North Arlington sites were considered in a 1985 study for the Army Corps of Engineers which concluded that Ridgefield was the only feasible alternative for the proposed facility. The Rutherford site was unavailable for the same zoning problem as the Lyndhurst site.

Ridgefield also argues that the Utilities Authority and American Ref–Fuel failed to establish that denial of the stream encroachment permit would create an undue hardship because the Army Corps of Engineers section 404 permit allowing construction has not yet been received. We consider this argument meritless in light of the solid waste disposal crisis facing the county and its need under its solid waste management plan to construct the resource recovery facility. Undue hardship is plain on the face of the record from the amount of time that elapsed in the preparation of the plans for the project and the substantial expense involved to the county and its taxpayers. Such an argument could be applied as to both permit applications and would only result in further delay and expense. No useful purpose would be served by more delay.

The DEP determined that there was no feasible or prudent alternative. It essentially accepted the site selection studies submitted by the Utilities Authority and American Ref–Fuel. In addition, the DEP's engineering report found:

1) The site selection was done by the county in accordance with the criteria of the Solid Waste Management Act. Other sites were considered and rejected. The site selected by the County was certified by the Commissioner on May 1, 1980 and October 1, 1980.

2) The current design was a result of condensing the site layout to eliminate all unnecessary access thereby minimizing the wetlands disturbance on this site.

3) The wetlands disturbed will be mitigated by enhancing the quality of the remaining wetlands. A new diversity of open water, low marsh and existing phragmites will be provided. According to a report submitted to the COE a 1.4 to 1 improvement in wetland quality will be made.

4) The need for the project lies in the continuing solid waste problem in Bergen County where disposal space is severely limited. This project is necessary for public benefit.

The DEP's Bureau of Flood Plain Management report concluded that there was no feasible and prudent alternative, including the no action alternative, which would avoid or substantially reduce the hydraulic, environmental or other damage and which is consistent with the reasonable requirements of public health, safety and welfare available. Therefore, the requirements of *N.J.A.C.* 7:13-5.4 were met.

Our review of the action of an administrative agency, such as the DEP, is limited. *Gloucester County Welfare Board v. N.J. Civil Service Comm.*, 93 *N.J.* 384, 390 (1983). It is not our function to substitute our judgment for that of the DEP where there may exist a mere difference of opinion concerning whether the stream encroachment permit or the other permits should issue. *First S. & L. Assn. of East Paterson v. Howell*, 87 *N.J.Super.* 318, 321-22 (App.Div.1965), certif. den. 49 *N.J.* 368 (1967). A reviewing court does not reverse the decision of an administrative agency in such matters unless the agency determination in the issuance of a permit is shown to be arbitrary, capricious or unreasonable. See *Barry v. Arrow Pontiac*, 100 *N.J.* 57, 71 (1985). Our inquiry is limited to whether the agency action violates the enabling act's express or implied legislative policies; whether the record supports the determination made; and whether, in applying the legislative policies, the agency reached a conclusion which could not have been made upon a showing of the relevant factors. See *Public Service Electric & Gas v. N.J. Dept. of Environmental Protection*, 101 *N.J.* 95, 103 (1985). Courts give due regard to the expertise of the agency, particularly where the issues involve highly technical considerations which are within the agency's field of expertise. *Mayflower Securities v. Bureau of Securities*, 64 *N.J.* 85, 93 (1973).

Our study of the record in light of the arguments presented satisfies us that the determination of the DEP is not arbitrary,

capricious or unreasonable and is within the legislative framework and criteria. The issuance of the stream encroachment permit here involved complex issues and extensive studies over a long period of years. There is no viable basis to permit us to disturb the DEP's conclusion that no feasible alternative to the Ridgefield site was available.[5]

## II

We turn next to whether the issuance of a temporary solid waste permit prior to disclosure statement approval violates *N.J.S.A.* 13:1E–126 *et seq.* Ridgefield maintains that the DEP was without statutory authority to issue a temporary permit prior to approval of the disclosure statement required by *N.J.S.A.* 13:1E–128. Moreover, it contends that because of various antitrust actions against Browning–Ferris Industries (BFI), which jointly with Air Product Corp. owns American Ref–Fuel, as well as suits against various BFI subsidiaries, ultimately a permanent solid waste facility permit will be denied for failure to meet the requirements of *N.J.S.A.* 13:1E–133. Ridgefield thus argues that American Ref–Fuel should not receive a temporary permit because a permanent one cannot properly be issued by the DEP.

The Solid Waste Management Act provides for a disclosure process before a solid waste facility permit may issue. These regulatory provisions are designed to apply strict standards in the operating of licensed activities relating to the collection, treatment, storage and disposal of solid waste in order to uphold the public confidence and trust. See *N.J.S.A.* 13:1E–

---

[5]We reject American Ref–Fuel's contention that once a county's solid waste management plan has been approved by the DEP the issue of alternative site no longer exists. Our recent decision in *I/M/O of Approval of Sussex County Preliminary Environmental Impact Statement,* Docket No. A–4696–85 (decided January 16, 1987), did not, contrary to American Ref–Fuel's argument, preclude examination of alternative sites. There it was concluded that once a facility site has been selected as part of the original Plan adoption the Environmental Impact Statement does not need to consider alternative sites.

126. Thus, every application for such a permit must file with the DEP and the Attorney General a detailed disclosure statement including such information as the applicant's business holdings, liabilities, debts and officers, partners or directors. *N.J.S.A.* 13:1E–127 and 128. The statute directs the Attorney General to prepare an investigative report on the applicant "within 120 days, except that this deadline may be extended for a reasonable period of time, for good cause, by the department and the Attorney General." *N.J.S.A.* 13:1E–128b(3). It has been represented that because of the size of the applicant and the complexity of the financial statements involved that the Attorney General has not yet completed this report and it may still take some time to complete. Obviously, the 120 day requirement was not met and the extension provisions of *N.J. S.A.* 13:1E–128b(3) are apparently being relied on although there is no formal extension in the record.

The DEP may not approve issuance or renewal of a license regarding the handling of solid waste if an applicant or a person required to be listed in the disclosure statement has been convicted of the crimes or criminal provisions referred to in *N.J.S.A.* 13:1E–133b or their equivalent in any other jurisdiction.[6] See *N.J.S.A.* 13:1E–127g. See *Matter of NJPDES Permit No. 005527,* 216 *N.J.Super.* 1, 11–12 (App.Div.1987). However, *N.J.S.A.* 13:1E–133b allows for the issuance of a license notwithstanding such a criminal conviction if the entity or person has affirmatively demonstrated rehabilitation by clear and convincing evidence in light of the factors set forth in the statute.

As noted, the applicant must exhibit sufficient reliability, expertise and competency to operate a solid waste facility before a license will issue. *N.J.S.A.* 13:1E–133a. See *Matter*

---

[6]In addition, *N.J.S.A.* 13:1E–133e also allows disapproval of a license if this State's public policy is violated when an applicant's business conduct "creates a reasonable belief that the participation of that person in any activity required to be licensed under this act would be inimical to the policies of this act."

*of NJPDES Permit No. 005527,* 216 *N.J.Super.* 1, 11–12 (App. Div.1987).

The disclosure statement was submitted by American Ref–Fuel in 1986. The DEP then considered the submitted Engineering Design and Environmental and Health Impact Statement and was prepared to issue a solid waste facility permit. However, the Attorney General's review of the disclosure application had not been completed. Since a final decision could not be made until the disclosure process was complete the DEP issued a temporary permit under the authority of *N.J.A.C.* 7:26–16.5 so that American Ref–Fuel could begin construction of the resource recovery facility. Ridgefield argues that the DEP had no authority to issue a temporary permit prior to completion of the disclosure statement review.

The regulation under which the temporary permit was issued is *N.J.A.C.* 7:26–16.5(c) which now reads as follows: [7]

> In its discretion, the Department may issue a temporary registration for not more than one year to an applicant, if such issuance is necessary to prevent or ameliorate a hazard to the public health, safety or the environment; to prevent economic hardship to a public body, or otherwise serves some interest of the general public, and the applicant signs an agreement that it will cease its solid or hazardous waste operations upon the expiration date of the temporary registration if a license had not been approved by the Department, or upon order of the Department.

In *Mt. Olive Twp. v. DEP,* 225 *N.J.Super.* 94, 98 (App.Div. 1988), we recognized the authority of the DEP to issue a Master Performance Permit under *N.J.A.C.* 7:26–16.5 pending the investigative report from the Attorney General.

Ridgefield acknowledges that the only express statutory provision dealing with issuance of a temporary permit of up to six months is *N.J.S.A.* 13:1E–135. This provision applies where an

---

[7]The temporary permit issued November 24, 1987 pursuant to this regulation expired by its own terms on May 23, 1988 within one year. We inquired at oral argument as to what happens after the year expired. Although the language of the regulation does not seem to allow it, the State took the position that this regulation did not preclude a "reissue." We need not decide that issue at this time since it is not before us.

applicant "severs the interest of or affiliation with the person who would otherwise cause that disqualification." This section is not presently applicable since no determination has yet been made by the DEP regarding American Ref–Fuel's qualifications or any person who might cause disqualification. *N.J.S.A.* 13:1E–135 is inapplicable for the further reason that there is no requirement that the DEP obtain or seek the Attorney General's recommendation prior to issuance of a temporary permit.

As required by *N.J.A.C.* 7:26–16.5(c), American Ref–Fuel agreed in connection with its receipt of a temporary permit that it would cease operations upon expiration of the temporary permit if a permanent license had not been issued. It also agreed that the DEP could terminate the temporary permit at any time for any reason. The record before us adequately demonstrates that a temporary permit was required in light of the solid waste crisis and the lead time necessary to bring a resource recovery facility on line. The requirements of the regulation that issuance was necessary to prevent or ameliorate a public health hazard and to prevent economic hardship to a public body are present. It also appears that the DEP was concerned with a potential hazard to public health, safety and the environment.

Ridgefield argues that a temporary permit should not have been granted because a permanent license will not issue to American Ref–Fuel based on its disclosure statement as the Attorney General's investigation allegedly will show certain convictions. See *N.J.S.A.* 13:1E–133b and d. Since no license has been issued and no determination made, it would be premature for us to rule on this issue. Moreover, it is the obligation of the DEP and the Attorney General under *N.J.S.A.* 13:1E–133 to rule in the first instance.

There is no prohibition in the Solid Waste Management Act against the issuance of a temporary permit prior to disclosure statement approval. See, *e.g., N.J.S.A.* 13:1E–133d which al-

lows the DEP to defer a decision upon request if there are pending proceedings. Hence, *N.J.A.C.* 7:26–16.5(c) does not exceed the authority granted to the DEP to adopt implementing regulations.

Ridgefield's argument concerning the inability of American Ref–Fuel to be licensed due to legal problems is based primarily on various legal actions against one of two corporations holding its stock and a number of that corporation's subsidiaries involving allegations of violation of federal and state antitrust laws as well as environmental laws. Ridgefield takes the position that these legal actions preclude American Ref–Fuel from establishing a reputation for good character, honesty and reliability as required by *N.J.S.A.* 13:1E–133b and d. Even assuming that the factual allegations are accurate, such evidence is not before us in this record and is beyond the scope of our review in determining whether the action of the DEP is arbitrary, capricious or unreasonable. See *Barry v. Arrow Pontiac,* 100 *N.J.* 57, 71 (1985). Indeed, when the temporary permit was issued DEP indicated that violations by American Ref–Fuel's parent corporation and subsidiaries did not warrant denial of a license nor disqualification of individuals or entities within the applicant's corporate structure. Determination of whether American Ref–Fuel is qualified or not must be resolved by the DEP. It may conclude that despite criminal and civil violations the American Ref–Fuel corporate structure had been rehabilitated (see *N.J.S.A.* 13:1E–133b) so that a license could properly be approved.

### III

We turn next to Ridgefield's argument that the approved air pollution control permit for 0.015 grain per dry standard cubic foot (gn/dscf) corrected to 7% oxygen limit for particulate matter emission does not meet New Jersey's requirement that a resource recovery facility be equipped with

"state-of-the-art air emission technology." *N.J.S.A.* 13:1E–168a(2); *N.J.A.C.* 7:26–2B.4(b)5.

The proposed facility approved by the DEP is planned to utilize an electrostatic precipitator (ESP) to limit particulate emission, a by-product of the incineration process. The ESP system consists of alternating grids of wires and plates operating in a powerful electric field through which gas passes. An alternate method of emission control is by the use of a fabric filter or bag which collects particulate matter and forms a thick dust cake on the fabric. This alternate method was neither selected by American Ref–Fuel nor required by the DEP. Although Ridgefield does not clearly specify which form of emission control technology should be required, it argues, without establishing any clear basis for the assertion, that a state-of-the-art emission standard of 0.010 gn/dscf of particulate matter can and should be achieved instead of the 0.015 gn/dscf limit in the air pollution control permit.

Ridgefield refers to reports and studies prepared by DEP air pollution personnel, DEP consultants, EPA personnel, and Ridgefield's combustion engineering consultant as well as Department of Interior personnel indicating that an emission level of 0.010 gn/dscf has been achieved on similar resource recovery facilities. However, in *Matter of NJPDES Permit No. NJ0055247*, 216 *N.J.Super.* 1, 7–11 (App.Div.1987), a 0.015 gn/dscf emission level was held to be sufficiently stringent to satisfy both federal and state emission standards. In that case we addressed the same issue regarding the proposed Essex County resource recovery facility in Newark, and held that the findings and conclusions of the DEP approving a 0.015 gn/dscf emission standard were sufficiently established. 216 *N.J.Super.* at 10, citing *Mayflower Securities v. Bureau of Securities*, 64 *N.J.* 85, 92–93 (1973).

The Clean Air Act, 42 *U.S.C.* § 7401 *et seq.*, established federal permitting standards for the release of particulate matter emission from new resource recovery facilities. Air

quality regions within the State are divided into attainment and non-attainment areas. 42 *U.S.C.* § 7407. Attainment areas have pollutant levels at or below national air quality standards. Non-attainment areas have levels above the maximum standard. 42 *U.S.C.* § 7407; 42 *U.S.C.* § 7501(2). A resource recovery facility to be located in an attainment area must comply with the "best available control technology" (BACT) emission limitation. 42 *U.S.C.* § 7479(3). This standard balances economic and technological considerations rather than involving any particular design engineering. It does require that certain factors specified in the federal regulation must be taken into account. *I/M/O NJPDES Permit, supra* (216 *N.J. Super.* at 8).

On the other hand, a facility to be located within a non-attainment area must meet a more stringent standard of "lowest available emission rate" (LAER). 42 *U.S.C.* § 7501(3). LAER bars consideration of economic and environmental impacts which are most paramount to a BACT analysis, thereby amounting to a more stringent or difficult emission limitation. *I/M/O NJPDES Permit, supra* (216 *N.J.Super.* at 9).

While Congress has conferred primary authority to enforce the Clean Air Act upon the States, 42 *U.S.C.* § 7407(a), a state with a program equal to or more stringent than the federal requirements can seek EPA authorization to administer its program rather than leaving administration with the federal government. New Jersey has obtained such authorization in both attainment and non-attainment areas. *I/M/O NJPDES Permit, supra* (216 *N.J.Super.* at 9). See 40 *C.F.R.* § 52.157; 46 *Fed.Reg.* 21996 (April 15, 1981); 48 *Fed.Reg.* 16738 (April 19, 1983).

The New Jersey Air Pollution Control Act, *N.J.S.A.* 26:2C–1 *et seq.,* requires air pollution control equipment to incorporate "advances in the art of air pollution control developed for the

kind and amount of air containment emitted by the applicant's equipment" before an operating certificate is issued by the DEP. *N.J.S.A.* 26:2C–9.1(c). See also *N.J.A.C.* 7:27–8.4(b).

The Solid Waste Management Act directs the DEP to adopt rules and regulations for the engineering design of resource recovery facilities which include state-of-the-art air emission technology. *N.J.S.A.* 13:1E–168a(2). This requirement was codified in *N.J.A.C.* 7:26–2B.4(b)5. The term "state-of-the-art" has not been defined in state statutes or regulations. However, the term "advances in the art" referred to in the Air Pollution Control Act has been interpreted to include advances "as have acquired some degree of current use and as are not unreasonably costly in the light of the nature and utility of the industrial operation affected as well as the harm which failure to use them would visit upon the environment." *Campbell Foundry Co. v. Sullivan,* 119 *N.J.Super.* 51, 54 (App.Div.1972). Because that standard involves a balancing of factors the respondents in this case analogize it to the federal requirement for BACT under the Clean Air Act. Although, New Jersey does not specifically provide for a BACT standard, *N.J.A.C.* 7:27–18.1 includes a definition for LAER which is utilized by the Bureau of Air Pollution Control. That regulation specifies that the LAER standard is the most stringent emission limitation, but it refers to equipment incorporating "advances in the art of air pollution control." Hence, New Jersey's LAER standard can be equated with "advances in the art." See *Matter of NJPDES Permit, supra* (216 *N.J.Super.* at 10).

Because the proposed Ridgefield facility would be located in an attainment area, the BACT standard would be applicable for emission control. The Essex County facility under review in *Matter of NJPDES Permit, supra,* was in a non-attainment area and a LAER standard was utilized for particulate matter along with the requirement for consideration of equipment involving "advances in the art." 216 *N.J.Super.* at 10.

In this case, regardless of which standard is utilized to review issuance of the air pollution control permit there is ample evidence to sustain the permit. Since a 0.015 gn/dscf limit for particulate matter was found to be acceptable under the stringent LAER standard, it would be sufficient under the BACT standard. See *Matter of NJPDES Permit, supra* (216 *N.J.Super.* at 10). DEP and American Ref–Fuel correctly point out that Ridgefield has not proffered anything different from what has already been examined by this court concerning the Essex County facility to demonstrate that a 0.015 gn/dscf particulate limit should be mandated. The fact that a consultant may have a different opinion and conclusion from the one ultimately adopted by the EPA or the DEP does not require setting aside or remanding an air pollution control permit for reconsideration. As stated in *Matter of NJPDES Permit, supra:*

> Where as here, the Legislature has entrusted an administrative agency with the responsibility of selecting the means of achieving an articulated statutory policy, the relationship or nexus between the remedy and the goal sought to be accomplished is particularly a matter for administrative competence. [216 *N.J.Super.* at 11, citing *In re Marvin Gastman,* 147 *N.J.Super.* 101, 110 (App.Div.1977)].

With respect to Ridgefield's argument concerning the emission limit during boiler tube rapping, there is no basis to disturb the DEP's determination. In this area the court must defer to the administrative expertise of the DEP as the agency charged with administering the regulations and standards. *Newark v. Natural Resource Council, Dept. of Environmental Protection,* 82 *N.J.* 530, 540 (1980), *cert.* den. 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980); *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599 (1965). We likewise reject Ridgefield's argument that there are additional flaws in the air pollution control permit. Due deference must be accorded the DEP's determination. *Newark v. Natural Resource Council, etc., supra.*

Affirmed.