569 A.2d 826

IN THE MATTER OF APPLICATION BY PENNSAUKEN SOLID WASTE MANAGEMENT AUTHORITY TO CONSTRUCT AND OPERATE A SOLID WASTE RESOURCE RECOVERY FACILITY.

IN THE MATTER OF THE PERMIT TO CONSTRUCT, INSTALL, OR ALTER CONTROL APPARATUS OR EQUIPMENT AND TEMPORARY CERTIFICATE TO OPERATE CONTROL APPARATUS OR EQUIPMENT AND PREVENTION OF SIGNIFICANT DETERIORATION PERMIT ISSUED TO THE PENNSAUKEN SOLID WASTE MANAGEMENT AUTHORITY.

Superior Court of New Jersey
Appellate Division

Argued January 18, 1990—Decided February 8, 1990.

Before Judges KING, SHEBELL and BAIME.

*Thomas S. Germine* argued the cause for appellants Township of Cinnaminson, Borough of Palmyra, and Borough of Riverton (*Thomas S. Germine* on the brief).

*Louis R. Meloni* argued the cause for respondent Pennsauken Solid Waste Management Authority (*Veronica, Meloni & Vecchio*, attorneys; *Louis R. Meloni* on the brief).

*Michael S. Caro,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (*Robert J. DelTufo*, Attorney General, attorney; *Michael R. Clancy*, Assistant Attorney General, of counsel; *Michael S. Caro* on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

These consolidated appeals present difficult questions arising under the Solid Waste Management Act (*N.J.S.A.* 13:1E–1 to –198) and the Air Pollution Control Act (*N.J.S.A.* 26:2C–1 to –36). The principal issue pertains to the scope and applicability of regulatory procedures adopted by the Department of Environmental Protection (DEP) for the modification of previously issued solid waste permits. Additional issues are raised relating to the standards to be applied in determining whether proposed air emission technology satisfies "state-of-the-art" and "advances in the art" criteria set forth in *N.J.S.A.* 13:1E–168a(2) and *N.J.S.A.* 26:2C–9.2(c), respectively. The final question concerns the extent to which an engineering design submission must identify disposal locations and facilities for hazardous and non-hazardous residues and bypassed materials under *N.J. A.C.* 7:26–2.6.

Appellants, three Burlington County municipalities, challenge the action of the DEP issuing permits to the Pennsauken Solid Waste Management Authority (Authority) approving various aspects of the construction of a resource recovery facility to be built on a 3.3 acre undeveloped site in an industrial area. The facility is to be constructed within the confines of a 153 acre

sanitary landfill in which non-hazardous residues and bypassed material will be disposed. As proposed, the facility will have the capacity to process approximately 500 tons per day of solid waste material and will produce electrical energy to be purchased by power companies.

We will subsequently describe the arguments advanced by appellants in greater detail. Suffice it to say here, they assert that (1) the solid waste permit issued by the DEP and its approval of the Authority's Environmental and Health Impact Statement (EHIS) were faulty because the impact of air pollution control technology later required by the federal Environmental Protection Agency (EPA) was not analyzed and that this defect cannot be cured by way of the modification procedures provided by *N.J.A.C.* 7:26–2.6, (2) the air pollution control permit was improperly granted because it fails to require installation of "state-of-the-art" and "advances in the art" technology designed to yield the most stringent emission limit for nitrogen oxides ($NO_x$) as mandated by statute and regulation and (3) the Authority's identification of disposal alternatives for ash residuals generated by the facility does not satisfy the content requirements contained in DEP regulations. Although appellants purport to appeal from the issuance of three permits,[1] only two are actually challenged. Specifically, appellants attack the DEP's issuance of the solid waste permit and the air pollution control permit. The NJPDES permit issued by the DEP is not implicated in this appeal.

We have carefully reviewed the voluminous record and find no merit in the contentions advanced. We are thoroughly convinced that the DEP complied meticulously with all federal and state statutory and regulatory provisions. Although the

---

[1]Appellants appeal from the grant of the modified NJPDES permit issued under the Water Pollution Control Act, *N.J.S.A.* 58:10A–1 to –60, the air pollution control permit issued under the Air Pollution Control Act, *N.J.S.A.* 26:2C–1 to –36, and the solid waste permit issued pursuant to the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 to –198.

air pollution control technology designed to reduce $NO_x$ emissions which the Authority now proposes to install was not evaluated when the DEP issued the solid waste permit, we are of the view that the modification procedures provided by *N.J. A.C.* 7:26–2.6, if properly applied, constitute sufficient safeguards and adequately protect the public interest. We are also satisfied that the DEP fairly applied appropriate statutory and regulatory standards in issuing the air pollution control permit. Finally, we find no basis for disturbing the DEP's conclusion that alternative residual landfills and facilities were adequately identified. We affirm.

## I.

The salient facts are not in dispute and are essentially a matter of public record. The chronology of events is important to an understanding of the issues raised. On January 13, 1987, the Authority submitted a solid waste facility application package consisting of an engineering design proposal and an EHIS to the DEP. Additional applications for modification of the Authority's existing NJPDES permit and for an air pollution control permit were filed simultaneously. The air pollution control permit sought by the Authority consists of two components. The State component consists of an authorization to construct or install control apparatus or equipment and a separate permit to operate such devices. The federal component consists of a prevention of significant deterioration permit (PSD).

These applications were distributed to various federal, State and local agencies for their evaluation. After requesting and receiving additional information and requiring modifications of the proposal, the DEP directed the Authority to respond to all agency review comments received. In December of 1987, the DEP tentatively approved the three permits requested pursuant to *N.J.S.A.* 13:1E–5.1. Concurrently, the DEP issued draft

solid waste, air pollution control and NJPDES permits and solicited public comment.

We need not recount at length the protracted hearings that followed. It is enough to note that approximately 122 people gave oral testimony and written comments were received from several hundred individuals and organizations.

Finally, on June 30, 1988 the DEP issued a voluminous report responding in great detail to all written and oral comments received. On the same date, the DEP approved the Authority's EHIS and granted the permits requested.

As designed and as approved, it was envisioned that the facility would process much of Camden County's solid waste, reducing materials by combustion to ash residue. Approximately 150 tons of ash residue are to be produced on a daily basis. From this residue, ferrous metals will be removed for resale. The remaining ash will be stored prior to testing and will ultimately be disposed, along with bypassed materials and non-combustibles, in a sanitary landfill adjacent to and surrounding the facility. Hazardous waste is to be shipped to out-of-state facilities.

Under the solid waste permit and the air pollution control permit originally issued by the DEP, the Authority was obliged to take extensive measures to reduce the emission of contaminants. Air pollution control devices were to include auxiliary natural gas fired burners in each furnace, various types of dry scrubbers and fabric filter baghouses. Each furnace was to be equipped with an auxiliary burner to insure that combustion gas temperatures would be constantly maintained at levels that will efficiently burn toxic and odorous air contaminants. The flue gas was to be fed into autonomous dry scrubbers where an aqueous lime slurry would be injected so as to react with certain acid components, thereby forming calcium salts that were to exit as particulate matter. After leaving the dry scrubbers, the gas was to pass through a fabric filter baghouse which would collect all particulate matters that, in turn, would

be conveyed to the ash removal area for analysis and disposal. The clean flue gas would then exit the baghouse and enter a single 285 foot stack from which it would be discharged.

Significantly, the proposed facility approved by the DEP did not provide the latest or most advanced technology designed to control and reduce $NO_x$ emissions. This omission is critical to an understanding of the issues raised because appellants contend that it fatally marred the permitting process.

Immediately following the DEP's issuance of the solid waste permit and the air pollution control permit, appellants filed an appeal to this court and simultaneously petitioned the Administrator of the Environmental Protection Agency (EPA) to administratively review the facility's federal air permit, the PSD. *See* 40 *C.F.R.* 124.19. In its petition, appellants contended that the facility's proposed $NO_x$ pollution controls were not sufficiently stringent to satisfy federal emission standards. While we will describe the concept in greater detail later in our opinion, appellants asserted that the facility's proposed $NO_x$ emission control apparatus did not satisfy the "Best Available Control Technology" (BACT) standard required by the federal Clean Air Act (42 *U.S.C.* § 7401 et seq.) and applicable regulations.

On December 10, 1988, the EPA issued an order remanding the matter to the DEP for further proceedings. In its accompanying opinion, the EPA determined that the BACT analysis of $NO_x$ emissions by the DEP was inadequate. The EPA found that the Authority failed to sustain its "burden of showing that an emission limitation based on combustion controls alone," as proposed in the design approved by the DEP, satisfied the BACT requirement. The DEP was directed to reopen the permit proceeding "for the limited purpose of allowing the [Authority] to supplement its original BACT analysis...." The DEP was not precluded from determining that "combustion controls alone represent BACT." Rather, it was directed to take additional evidence on the subject and "reissue the permit as written" if it determined that combustion represented the

best achievable technology to minimize $NO_x$ emissions. Conversely, the EPA authorized the DEP to "revise the limitations and other conditions of the permit as appropriate" if it found that other technology satisfied the BACT mandate.

Pursuant to the remand order, the facility vendor submitted a lengthy revision of the BACT analysis for $NO_x$. That report proposed installation of an innovative control technology known as Thermal De–$NO_x$ designed to reduce $NO_x$ emissions. The Thermal De–$NO_x$ method, technically designated as "selective non-catalytic reduction," reduces $NO_x$ to nitrogen and water vapor by injecting ammonia directly into the furnace. Although another technology, selective catalytic reduction, theoretically provides a 90 to 95 percent $NO_x$ removal efficiency, and was considered by the DEP, it is apparently not in use in the United States. The DEP thus determined that Thermal De–$NO_x$, which has a 30 to 60 percent $NO_x$ removal efficiency and which is presently used elsewhere in the United States, better satisfied federal and state standards. A draft air pollution control permit requiring installation of Thermal De–$NO_x$ and a corresponding lower emission limit for $NO_x$ was prepared and published.

Public comments were received between December 23, 1988 and January 30, 1989. In addition, a public hearing was conducted at which 35 people appeared and gave oral testimony.

On February 10, 1989, the DEP issued an extensive report responding to the concerns expressed in the comments received. On the same date, the DEP granted a new air pollution control permit which required installation of Thermal De–$NO_x$ and a $NO_x$ emission limit almost 33 percent more stringent than the permit it superseded.

Appellants petitioned the EPA to review the new air pollution control permit, arguing that the revised $NO_x$ emission limit reflected therein was insufficient. On April 20, 1989, the EPA rejected appellants' contentions, thus affirming the federal PSD permit. Appellants did not appeal the final PSD permit to the

Court of Appeals, the sole judicial review remedy by which they could challenge that decision. *See* 40 *C.F.R.*, 124.19. Instead, they filed an appeal in this court from the DEP's grant of the air pollution control permit. We consolidated the separate appeals of the solid waste permit and the air pollution control permit. We now consider the issues presented.

## II.

■ We first address appellants' argument that the DEP's issuance of the solid waste permit was improper because it rested upon a design plan of the facility which did not include Thermal De–NO$_x$ pollution control equipment. Emphasizing the elaborate nature of the Thermal De–NO$_x$ system and the correspondingly sophisticated design changes required by installation of that equipment, appellants contend that the solid waste permit should be set aside. The Thermal De–NO$_x$ pollution control system, now required by the facility's air pollution control permit, consists of a 4,500 gallon ammonia storage tank, an elaborate tank containment dike system designed to insure safe ammonia storage, air compressors, a piping delivery system, and ammonia injectors feeding into the solid waste furnaces. The Thermal De–NO$_x$ system requires on-site storage of thousands of gallons of anhydrous ammonia, a substance which is categorized as an "[e]xtremely [h]azardous [s]ubstance" under the New Jersey Toxic Catastrophe Prevention Act (*N.J.S.A.* 13:1K–19 et seq.), pursuant to which emergency evacuation plans are mandated to protect against the accidental release of highly toxic chemicals. Although the revised air pollution control permit explicitly requires utilization of Thermal De–NO$_x$, the DEP never considered the design aspects of this technology when it approved the Authority's EHIS and granted the solid waste permit. Appellants thus contend that the DEP's consideration of the Authority's application was fatally flawed from its inception and that the solid waste permit granted was void *ab initio*.

We agree that the DEP has never considered the specific design features for the Thermal De-$NO_x$ system. Nor has it yet embarked upon an environmental impact assessment as required by *N.J.A.C.* 7:26-2.4(c) and (g)19 relating to that system. The reason for this omission is apparent. When the DEP reviewed the Authority's application and related submissions and issued the solid waste permit, the underlying thesis was that Thermal De-$NO_x$ was not an available technology. Thus, the design plans submitted by the Authority and, as modified, later approved by the DEP did not include Thermal De-$NO_x$ apparatus. For the same reason, no reference was made in the EHIS approval to Thermal De-$NO_x$.

This much conceded, following the DEP's grant of the new air pollution control permit the Authority submitted an application to modify its existing EHIS approval and the solid waste permit to include the Thermal De-$NO_x$ control system. Although the existing solid waste permit allows the Authority to commence construction of the facility in other respects, no similar authority has been granted pertaining to the Thermal De-$NO_x$ related aspects of the structure. Stated simply, no feature of the Thermal De-$NO_x$ system may be constructed until supplemental engineering designs depicting its specific layout and controls as well as an environmental impact analysis have been reviewed and approved by the DEP. We are advised that this process is presently ongoing.[2]

Appellants acknowledge that the Authority has sought modification of its EHIS approval and solid waste permit to include Thermal De-$NO_x$. They contend, however, that the modification procedures provided by *N.J.A.C.* 7:26-2.6 do not apply to design features not originally considered by the DEP in granting a solid waste permit but which are later mandated or compelled by the EPA. Appellants assert that the modification

---

[2]We withhold comment on the desirability of such an agency procedure, noting only that unfavorable financial consequences could flow if final approval of a satisfactory emission limitation system is not forthcoming.

procedures set forth in *N.J.A.C.* 7:26–2.6 apply only to "discretionary" changes, either at the request of the applicant to encompass voluntary design alterations or on the initiative of the DEP itself. They urge that modification is not permitted with respect to changes mandated by the EPA and not considered by the DEP when the solid waste permit was originally granted. Appellants assert that a modification compelled by the EPA requires a reversal of the solid waste permit and commencement of the permitting process anew.

We disagree. Although our research discloses no reported decision bearing upon the precise issue, we find nothing in the regulation supporting the mandatory-discretionary modification dichotomy urged by appellants. *N.J.A.C.* 7:26–2.6 provides in pertinent part that "[w]hen the [DEP] receives any information concerning a solid waste permit, it may determine whether or not one or more of the causes [designated elsewhere in the regulation] for modification, or revocation and reissuance" exist. If the DEP finds that "cause exists," it "may modify, or revoke and reissue the [solid waste permit] accordingly ... and may require an updated application, if appropriate." *N.J.A.C.* 7:26–2.6(a)1. Among the causes for modification or revocation, "at the discretion of the [DEP]," provided by the regulation is "information that was not available at the time of permit issuance that would have justified the application of different permit conditions...." *N.J.A.C.* 7:26–2.6(a)3ii. This may "include any information indicating that the effects on the environment are unacceptable or that the facility is being operated in an environmentally unsound manner." *Ibid.* In a similar vein, modification is permitted where "[t]here are material and significant alterations or additions to the permitted facility or operation which occurred after permit issuance which justify the application of permit conditions that are different from or absent in the existing permit." *N.J.A.C.* 7:26–2.6(a)3i.

We need not decide whether either or both of these "causes" for modification are present in this case. That is the function of the DEP. We merely note that either or both of these

provisions are arguably applicable because the EPA's remand order and the revised BACT analysis indicate the appropriateness of more stringent $NO_x$ control measures which makes the conditions set forth in the original permit environmentally unsound.

The point to be stressed is that *N.J.A.C.* 7:26–2.6 confers broad discretion on the DEP to determine what course to follow. This solution comports with common sense and advances the policy of promoting the construction of resource recovery facilities consonant with the protection of the public health and safety. Where a solid waste permit is set aside by us or revoked by the DEP, "the entire permit [is to be] reopened for public comment in accordance with the procedures set forth in *N.J.A.C.* 7:26–2.4." *N.J.A.C.* 7:26–2.6(e)iv. In contrast, "[i]n a permit modification only those conditions to be modified [are to be] reopened for public comment" and "[a]ll other aspects of the existing permit [are to] remain in effect for the duration of the unmodified permit." *N.J.A.C.* 7:26–2.6(e)ii. The modification procedure thus permits correction of specific problems without the severe dislocations which would be caused by a total halt in the construction or operation of a facility. Moreover, the public interest is furthered and protected by the elaborate procedural safeguards attendant to the modification process.[3] *See N.J.A.C.* 7:26–2.6(e) and *N.J.A.C.* 7:26–2.4. As we pointed out previously, in the context of this case, pursuant to the existing solid waste permit, the Authority is free to construct the non-De–$NO_x$ aspect of the facility. *N.J.A.C.* 7:26–2.6(e). It may not construct the facility's proposed Thermal De–$NO_x$ system or its related aspects until permit modification is approved.

Even were we to adopt the distinction urged by appellants, they would fare no better. As we took pains to note in our

---

[3]We are confident, in view of the recognition by all parties as to the potential for danger to persons and property, that adequate due process will be afforded to all interested parties and organizations.

recital of the facts, the EPA never mandated that a Thermal De–NO$_x$ system be installed. Rather, the federal agency merely determined that the record was incomplete and that the Authority had not sustained its burden of showing that combustion alone satisfied the BACT standard. On remand, the DEP exercised the discretion accorded to it by statute and decided that the installation of Thermal De–NO$_x$ would best comport with the BACT standard. Thus, the new air pollution control permit required that the Thermal De–NO$_x$ technology be used, a condition set by the DEP, not the EPA.

Appellant's remaining argument that emergency contingency plans are required, see *N.J.A.C.* 7:26–2B.4(a)20, and the solid waste permit must be voided because they have not been provided is without merit. Final plans must be submitted to the DEP within three months of the commencement of facility start-up pursuant to condition 9 of the existing permit. Thermal De–NO$_x$ related preliminary plans are to be reviewed by the DEP in the course of the modification process.

### III.

We next consider appellants' argument that the DEP erroneously granted the Authority's application for an air pollution control permit.[4] More specifically, appellants contend that the emission limit for NO$_x$, as measured by control efficiency, does not satisfy New Jersey's requirement that the engineering design of resource recovery facilities must include "state-of-the-

---

[4] We find no merit in appellants' procedural argument that the public notice of the remanded proceedings pertaining to the revised air pollution control permit was faulty. *R.* 2:11–3(e)(1)(E). Appellants claim that the notice incorrectly implied that only the federal PSD permit was to be considered. As we noted previously, the air permit actually consisted of two State approvals and a draft federal air permit approval. They were issued as a package. Both the draft permit issued prior to the comment period and the final permit issued thereafter denote the title "permit to construct, install, or alter control apparatus or equipment and temporary certificate to operate control apparatus or equipment and prevention of significant deterioration permit." We deem this notice sufficient and complete.

art emission technology," *N.J.S.A.* 13:1E–168a(2), and that the equipment utilized "incorporate advances in the art of air pollution control for the kind and amount of air contaminant emitted...." *N.J.S.A.* 26:2C–9.2(c). Although the phrase "state-of-the-art" appears in the Solid Waste Management Act and the term "advances in the art" is employed in the Air Pollution Control Act, we deem these expressions to be substantially equivalent.

■ At issue is the meaning of these terms. Stripped to its essentials, appellants' argument rests upon the thesis that "state-of-the-art" or "advances in the art" requires the installation of pollution control equipment which yields the lowest available emission rate. They assert that the DEP ignored this standard when it issued a new air pollution control permit following the EPA's remand order. Respondents ascribe a different meaning to the phrases "state-of-the-art" and "advances in the art" in the context of the facts of this case. They argue that the Legislature intended a less stringent standard which requires merely that the equipment used must incorporate such advances as have acquired some degree of current use and as are not unreasonably costly in the light of the nature and utility of the industrial operation affected as well as the harm which failure to use them would visit upon the environment. Unfortunately, the term "state-of-the-art" and "advances in the art" have received uneven treatment in various cases and our reported decisions on the subject are not entirely consistent. *Compare Matter of Stream Encroachment Permit,* 231 *N.J.Super.* 443, 555 *A.*2d 1123 (App.Div. 1989), and *NJPDES Permit No. NJ 0055247,* 216 *N.J.Super.* 1, 522 *A.*2d 1002 (App.Div.1987), certif. den. 108 *N.J.* 185, 527 *A.*2d 1390 (1987), with *Campbell Foundry Co. v. Sullivan,* 119 *N.J.Super.* 51, 289 *A.*2d 801 (App.Div.1972).

The subject is extremely technical and requires a description of the federal and state statutory and regulatory provisions. Many of the statutory and regulatory requirements are ana-

lyzed in our opinions in *NJPDES Permit No. NJ 0055247* and *Matter of Stream Encroachment Permit.* We need not ret-read upon ground so exhaustively covered in these decisions. However, we are constrained to provide a broad overview of the statutory and regulatory context in which the issues presented here are to be considered.

The federal Clean Air Act divides regions into attainment and nonattainment areas. 42 *U.S.C.* § 7407. Those areas with pollutant levels for a particular contaminant at or cleaner than air quality standards as defined by the federal Act constitute "attainment areas." 42 *U.S.C.* § 7407. Those with pollutant levels above the maximum air quality standards are "nonattainment areas." 42 *U.S.C.* § 7407 and § 7501(2).

A facility which is located in an attainment area must employ an emissions limitation which reflects the "best available control technology" (BACT). Although BACT does not require any particular engineering design, it does mandate an achievable emission limitation based upon a variety of factors enumerated in the federal regulations. *See* 42 *U.S.C.* § 7479(3). We need not describe all of the myriad considerations which are to be assessed in a BACT analysis. It suffices to note that BACT "involves a balancing of economic and technological considerations" designed to reflect an accommodation of competing environmental, practical and cost factors. *NJPDES No. NJ 0055247,* 216 *N.J.Super.* at 8, 522 *A.*2d 1002.

If a facility is located in a nonattainment area, far more stringent standards are applied. Specifically, the applicant must use technology capable of achieving the "lowest available emission rate" (LAER). 42 *U.S.C.* § 7501(3). We need not describe or consider the intricacies attendant to the application of the LAER standard. We merely emphasize that LAER is a far more stringent test because it tends to bar or at least minimize consideration of economic and cost impacts which are more prominent in a BACT analysis. *See Matter of Stream Encroachment Permit,* 231 *N.J.Super.* at 461, 555 *A.*2d 1123.

As we pointed out in *NJPDES Permit No. 0055247*, the federal Act contains one further refinement designed to insure effective regulation of contaminant emissions. *Id.* 216 *N.J.Super.* at 9, 522 *A.*2d 1002. Congress conferred upon the states the primary authority for enforcing proper air quality in their respective geographic areas. 42 *U.S.C.* § 7407(a). If a state has a program that is essentially equivalent or more stringent than the federal regulatory scheme, it can seek authorization from the EPA to administer its standards in lieu of its federal counterpart. New Jersey has received full authorization to apply its standards in both attainment and nonattainment areas. *See* 40 *C.F.R.* § 52.157; 48 *Fed.Reg.* 16738 (April 19, 1983); 46 *Fed.Reg.* 21996 (April 15, 1981). While, as illustrated by this case, the EPA has not totally surrendered enforcement jurisdiction, this State, through the DEP, is vested with the principal authority to protect air quality.

The Pennsauken region is currently an attainment area for nitrogen oxide. Under the federal Act, therefore, the BACT standard is applicable. However, as we noted, appellants contend that the "state-of-the-art" or "advances in the art" criterion incorporates the LAER standard. In support of their argument, appellants cite our decisions in *NJPDES Permit No. NJ 0055427* and *Matter of Stream Encroachment Permit.* We find that both decisions are inapposite, however.

Appellants reliance on *NJPDES Permit No. NJ 0055247* is clearly misplaced. There, the DEP's grant of an air pollution control permit was challenged on the basis that the emission limitation for particulates and ozone was not sufficiently stringent. *Id.* at 5, 522 *A.*2d 1002. We rejected that argument on the ground that there was sufficient evidence present in the record to support the DEP's determination. In the course of our opinion, we observed that the LAER standard was applicable because Essex County, the site of the facility, was a nonattainment area for particulates and the entire state was a nonattainment area for ozone. *Id.* at 9, 522 *A.*2d 1002. While we noted that New Jersey statutes and regulations impose a

requirement that the equipment used incorporates advances in the art of air pollution control for the kind and amount of air contaminant emitted by the applicant's facility, *id.* at 10, 522 *A.*2d 1002, we had no occasion to offer a definition of that term in the context of an attainment area. *Id.* at 10–11, 522 *A.*2d 1002.

Our decision in *Matter of Stream Encroachment Permit* is also distinguishable. We were there concerned with a challenge to an air pollution control permit which allowed an 0.015 gram per dry standard cubic foot corrected to a 7% oxygen limit for particulate matter emission. *Id.* 231 *N.J.Super.* at 459, 555 *A.*2d 1123. The proposed facility was to be located in an attainment area and thus the BACT standard was applicable for emission control. *Id.* at 462, 555 *A.*2d 1123. Although in our opinion we said in passing that "New Jersey's LAER standard can be equated with 'advances in the art,'" *ibid.*, that statement was mere *dictum.* We found that "regardless of which standard [was] utilized to review issuance of the air pollution control permit," BACT or LAER, there was ample evidence supporting the DEP's determination that the proposed facility incorporated "advances in the art." *Id.* at 462–463, 555 *A.*2d 1123.

We are not writing on a blank slate, however. In *Campbell Foundry Co. v. Sullivan,* 119 *N.J.Super.* 51, 289 *A.*2d 801 (App.Div.1972), we had occasion to interpret the phrase "advances in the art" in the context of the DEP's denial of a certificate to operate an air pollution control device under the Air Pollution Control Act. *Id.* at 53, 289 *A.*2d 801. We held that "[t]he Legislature should be taken to have intended such advances in the art as have acquired some degree of current use and as are not [unreasonably] costly in light of the nature and utility of the industrial operation affected as well as the harm which failure to use them would visit upon the environment." *Id.* at 54, 289 *A.*2d 801. This is the standard advanced by the DEP in this appeal.

In essence, appellants contend that *Campbell Foundry Co. v. Sullivan* was wrongly decided. We reject that argument and adhere to our holding in *Campbell Foundry*. Notwithstanding that the "advances in the art" standard applies to the selection of pollution control technology and the BACT standard to selection of the appropriate emission limitation, both tests involve a balancing of essentially the same factors.

■ In reaching this conclusion, we have accorded substantial deference to the contemporaneous construction, long usage and practical interpretation given to the Air Pollution Control Act and more particularly to the phrase "advances in the art" by the DEP, the administrative agency charged with enforcement of the statutory scheme. *See Smith v. Director, Div. of Taxation*, 108 *N.J.* 19, 25–26, 527 *A.2d* 843 (1987); *Malone v. Fender*, 80 *N.J.* 129, 137, 402 *A.2d* 240 (1979); *Service Armament Co. v. Hyland*, 70 *N.J.* 550, 561, 362 *A.2d* 13 (1976); *The Passaic Daily News v. Blair*, 63 *N.J.* 474, 484, 308 *A.2d* 649 (1973); *Pringle v. N.J. Dept. of Civil Service*, 45 *N.J.* 329, 332–333, 212 *A.2d* 360 (1965). The record reflects that the DEP has consistently applied *Campbell Foundry*'s definition of "advances in the art" with respect to attainment areas. The agency's construction of the statutory phrase over a period of some 18 years without legislative interference is to be accorded great weight as evidence of its conformity with the legislative intent. *Malone v. Fender*, 80 *N.J.* at 137, 402 *A.2d* 240; *Automatic Merchandising Council v. Glaser*, 127 *N.J.Super.* 413, 420, 317 *A.2d* 734 (App.Div.1974); *Lavitz v. Civil Serv. Comm.*, 94 *N.J.Super.* 260, 266, 227 *A.2d* 722 (App.Div.1967); *Housing Auth. of Jersey City v. Dept. of Civil Service*, 87 *N.J.Super.* 146, 149, 208 *A.2d* 416 (App.Div.1965); *Walsh v. Dept. of Civil Service*, 32 *N.J.Super.* 39, 48–49, 107 *A.2d* 722 (App.Div.1954), certif. granted 17 *N.J.* 182, 110 *A.2d* 344 (1955).

■ We also note the strong presumption of reasonableness that an appellate court must accord an administrative agency's exercise of statutorily delegated responsibility. *See New Jer-*

*sey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 562–563, 384 *A.*2d 795 (1978). This presumption of reasonableness is even stronger here as the agency has been delegated discretion to determine the specialized and technical procedures for its tasks. *Newark v. Natural Resource Coun. Dept. Env. Prot.,* 82 *N.J.* 530, 540, 414 *A.*2d 1304 (1980), *cert.* den. 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980).

We find no merit in appellants' contention that regulatory developments since *Campbell Foundry* have served to modify the "advances in the art" standard. Specifically, they refer to the definition of LAER set forth in *N.J.A.C.* 7:27–18.1. That section reads as follows:

[T]he rate of emission from any equipment, facility, or control apparatus which incorporates advances in the art of air pollution control developed for the kind and amount of air contaminant emitted by the equipment or facility. For the purposes of this subject, advances in the art of air pollution control shall result in an emission limitation at least as stringent as:

(1) The most stringent emission limitation which is contained in the implementation plan of any state for such class or category of equipment or facility, unless the owner or operator of the proposed equipment or facility demonstrates that such limitations are not achievable; or

(2) The most stringent emission limitation which is achieved in practice by such class or category of equipment of facility; whichever is more stringent. In no event shall the application of this term permit proposed new or altered equipment or facilities to emit any pollutant in excess of the amount allowable under applicable federal new source standards of performance.

Appellants are incorrect in their assertion that this section creates an equation between "advances in the art" and LAER. While it is true that New Jersey's definition of LAER, as set forth in *N.J.A.C.* 7:27–18.1, incorporates "advances in the art" in determining the lowest available emissions rate, they ignore the provisions of *N.J.A.C.* 7:27–18.2(c) which confine application of the LAER standard to nonattainment areas.

■ Before leaving the subject, we would be remiss were we to fail to note that, regardless of which standard is to be applied, there is ample evidence in the record to sustain the permit. The record discloses that the proposed Thermal De–No$_x$ control system clearly reflects advances in the art of

pollution control technology. We stress that selective catalytic reduction (SCR) control technology for $NO_x$ is not currently employed with respect to a municipal solid waste incinerator anywhere in the United States. Moreover, in its experimental utilization in Japan, SCR has apparently been deemed unreliable due to latent difficulties associated with its use. It is highly doubtful that SCR would satisfy the advances in the art standard.

In contrast, Thermal De–$NO_x$ is currently used by two solid waste incinerators in the United States. Wholly apart from its lower capital and operating costs, Thermal De–$NO_x$ would seem to qualify as the type of pollution control system that would yield the lowest available emission rate.

In sum, we find no sound basis to disturb the conclusion reached by the DEP that Thermal De–$NO_x$ satisfies the advances in the art standard. It cannot be said that the issuance of the air pollution control permit constituted arbitrary, capricious or unreasonable administrative action or that it was not supported by sufficient credible evidence in the record. *Barry v. Arrow Pontiac, Inc.,* 100 *N.J.* 57, 71, 494 *A.*2d 804 (1985); *Gloucester County Welfare Board v. New Jersey Civil Service Comm'n.,* 93 *N.J.* 384, 391, 461 *A.*2d 575 (1983); *Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973); *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965).

## IV.

■ Appellant's final contention is that the solid waste permit should not have been granted because the Authority failed to identify the final repositories for waste streams of residues generated by the combustion process and bypassed materials as required by *N.J.A.C.* 7:26–2B.4(a)7. That regulation requires the applicant to identify:

[t]he proposed ultimate disposal location for all facility generated waste residues including, but not limited to, ash residues and bypass materials, by-products resulting from air pollution control devices, and the proposed alternate

disposal locations for any unauthorized waste types, which may have been unknowingly accepted. The schedule for securing contracts for disposal of these waste types at the designated locations shall be provided.

We find no merit in appellants' argument. In our view, the Authority complied with the regulatory provision by identifying its existing sanitary landfill as the final repository for non-hazardous ash residue and bypassed materials, and by designating four out-of-state facilities for the disposal of hazardous wastes. With respect to non-hazardous residues and bypassed materials, the Authority proposed a 40 acre expansion of its present landfill. We reject appellants' assertion that the solid waste permit should not have been issued prior to the approval of the landfill expansion.[5] *Cf. NJPDES Permit No. NJ 0055247*, 216 *N.J.Super.* at 13–15, 522 *A*.2d 1002. Nor do we agree with their suggestion that the Authority should have been required to enter into a contract with respect to the expansion of its landfill prior to issuance of the solid waste permit.

In a similar vein, we are satisfied that the Authority was not required to secure contracts for the disposal of hazardous residues and bypassed materials prior to issuance of the solid waste permit. *N.J.A.C.* 7:26–2B.4(a)7 does not require the applicant to enter into a contract with a hazardous disposal facility during the project permitting stage. The DEP has mandated that binding agreements must be in place prior to facility operation. We are convinced that the Authority comported fully with the requirements of *N.J.A.C.* 7:26–2B.4(a)7 when it identified in its permit application submissions several commercial disposal facilities that are currently licensed and operational with respect to the disposal of hazardous wastes.

---

[5] On August 30, 1989 the DEP approved by permit the expansion of the Authority's landfill as necessary to accommodate non-hazardous waste residuals from the resource recovery facility. However, for the reasons we have expressed, the fact that the expansion approval came after the issuance of the resource recovery facility permit is of no legal significance.

## V.

As in *American Cyanamid v. D. of Envir. Prot.*, 231 *N.J. Super.* 292, 555 *A.*2d 684 (App.Div.1989), certif. den. 117 *N.J.* 89, 563 *A.*2d 847 (1989), we have occasion to note the excellent quality of the briefs submitted by all parties in this highly technical case. *See State of Ohio v. United States E.P.A.*, 784 *F.*2d 224, 230 (6th Cir.1986). We appreciate their efforts.

Affirmed.