244 N.J. Super. 537 (1990)
582 A.2d 1288
TERMINAL CONSTRUCTION CORPORATION, PLAINTIFF-RESPONDENT,
v.
THE HOBOKEN-UNION CITY-WEEHAWKEN SEWERAGE AUTHORITY, A PUBLIC BODY POLITIC OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT, AND NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, A POLITICAL SUBDIVISION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT, AND HUDSON COUNTY UTILITIES AUTHORITY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued November 13, 1990.
Decided December 7, 1990.
*538 Before Judges PRESSLER, BAIME and ARNOLD M. STEIN.
Frank M. Leanza argued the cause for appellant (Leanza, Agrapidis & Kalebic, attorneys; Frank M. Leanza of counsel; Frank M. Leanza and Steve M. Kalebic on the brief).
*539 Richard J. Laiks argued the cause for respondent Terminal Construction Corporation (Heller & Laiks, attorneys; Richard J. Laiks on the brief).
Valerie W. Haynes, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Robert J. Del Tufo, Attorney General, attorney; Mary C. Jacobson, Deputy Attorney General, of counsel; Valerie W. Haynes on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
This appeal requires us to revisit the arcane subject of solid waste regulation. At issue is whether a thermal reduction facility designed to reduce the volume of sludge residuals through exposure to high temperature is exempt from the requirement of solid waste registration. The question is presented in a somewhat unusual factual setting. Defendant, the Hoboken-Union City-Weehawken Sewerage Authority (HUCWSA), seeks to rescind a contract it awarded to plaintiff, Terminal Construction Corporation (Terminal Construction), to build a sludge treatment plant. HUCWSA contends that it has not obtained a permit from the Department of Environmental Protection (DEP), which it argues is a prerequisite for construction of the facility under the Solid Waste Management Act (N.J.S.A. 13:1E-1 through -48). Under its Statewide Sludge Management Plan (SSMP), a component of the Statewide Solid Waste Management Plan (SWMP) adopted pursuant to N.J.S.A. 13:1E-6a(3) and N.J.S.A. 13:1E-46, the DEP has historically exempted sludge thermal reduction facilities from the solid waste permitting process. HUCWSA nevertheless argues that the exemption is not set forth in a duly promulgated regulation and thus the proposed treatment plant may not be constructed without a solid waste permit. The Law Division rejected HUCWSA's assertion and enjoined it from abrogating the contract. We affirm.

*540 I.
This case has a tortuous history. In 1979, the Hudson County Utilities Authority (HCUA) developed plans for a wastewater treatment facility. Shortly thereafter, the United States Environmental Protection Agency (EPA) and the DEP approved design plans for the proposed treatment plant. In addition, the EPA approved federal grant funds for the project.
For reasons that are not disclosed in the record, the project remained dormant. In the interim, the existing wastewater treatment facility has discharged treated effluent into the Hudson River without satisfying federal and state secondary treatment standards, resulting in a continuing series of regulatory actions by the EPA and the DEP. These proceedings culminated in the entry of a judicial consent order directing the City of Hoboken to meet interim deadlines for prior compliance actions. The City was directed to comply with a previously entered administrative consent order requiring it to construct a plant satisfying secondary treatment standards. Additionally, the City was ordered to adopt an acceptable residuals plan.
In compliance with the judicial and administrative consent orders, Hoboken proposed a wastewater treatment facility which included a residuals component for the stabilization and reduction of sewage sludge by an on-site gasification and power generation system.[1] On August 31, 1987 the EPA approved the proposal by issuing a "Finding of No Significant Impact," which specifically addressed primary and secondary effects of *541 the plant on hydrology and water quality, air quality, noise, natural resources, population projections and social and economic factors. One month later, the EPA awarded a grant to HCUA in the amount of $24,442,292 for the construction of the plant. Innovative grants were awarded in succeeding years amounting to $4,897,346.
On May 9, 1988 the DEP's Bureau of Engineering authorized HCUA to receive bids, pending issuance of the required air quality control permit. A single bid for the entire project was received, but the high dollar amount was unacceptable. HCUA then requested separate bids, one for the "liquid train" (effluent treatment) and the other for the "solids processing" (sludge). On November 21, 1989, the DEP authorized HCUA to award the contract for the effluent treatment component. Construction has commenced on that part of the project. Terminal Construction was determined to be the lowest qualified bidder for the sludge facility at approximately the same time.
The final air quality control permit was issued on May 18, 1990, accompanied by 12 pages of conditions. We need not recite the exacting federal and state standards that must be satisfied under the permit. See In re Pennsauken Solid Waste Mgt., 238 N.J. Super. 233, 569 A.2d 826 (App.Div. 1990). We merely note that every aspect of the design and engineering plans was exhaustively reviewed by the EPA and the DEP to insure environmental safety.
In any event, issuance of the final air quality control permit constituted the last outstanding item required prior to commencement of construction. The DEP thus authorized HUCWSA, which had been assigned HCUA's interest in the project, to conduct a preconstruction conference. However, HUCWSA abruptly cancelled the meeting. This development generated Terminal Construction's concern that HUCWSA wished to either delay or abrogate the contract. In that respect, we note that at some point HUCWSA had sought to delay issuance of the air quality control permit, apparently contending that the *542 gasification technology envisioned in the plans was inadequate. Although the DEP later rejected HUCWSA's arguments and, as we noted previously, issued the air quality control permit, Terminal Construction became convinced by the cancellation of the preconstruction conference that the Authority wished to abort the sludge management project.
On August 21, 1990 Terminal Construction instituted this action by filing an order to show cause and a verified complaint in the Law Division, seeking an order restraining HUCWSA from rescinding the contract. The DEP was named as a defendant. The sole issue presented was whether a solid waste permit constitutes a prerequisite for construction and operation of the proposed sludge treatment plant. In a thorough and well-reasoned oral opinion, Judge Wefing held that the DEP had properly exempted sludge thermal reduction facilities from the solid waste registration requirement pursuant to appropriate statutory authority. HUCWSA appealed and we directed that the matter be accelerated. We now affirm essentially for the reasons expressed by Judge Wefing.

II.
The provisions of the Solid Waste Management Act are described in great detail in A.A. Mastrangelo, Inc. v. Environmental Protection Dep't, 90 N.J. 666, 449 A.2d 516 (1982) and NJPDES Permit No. 005527, 216 N.J. Super. 1, 522 A.2d 1002 (App.Div. 1987). We limit our discussion here to several key sections. Under the Act, "new and existing solid waste collection and disposal facilities and operations" must be registered by the DEP. N.J.S.A. 13:1E-4a. Further, "[n]o person may proceed to construct, acquire, or operate any solid waste facility without having first obtained the approval of the [DEP's] commissioner." N.J.S.A. 13:1E-26. As part of the registration and approval process, the applicant must prepare an "environmental impact statement." Ibid. Pursuant to regulations adopted by the DEP, the statement is to contain a "realistic[]" *543 assessment of the probable impact of the proposed facility "upon the geology, soils, hydrology, air quality, ecology, land use, socioeconomics, aesthetics, history and archeology" of the surrounding area. N.J.A.C. 7:26-1.4. In addition, the statement must contain a "listing of adverse environmental impacts which cannot be avoided" and a "description of the steps to be taken to minimize" further degradation. Ibid. These statutory and regulatory requirements are designed to foster a "systematic, interdisciplinary approach in order to insure the integrated assessment of technical, economic, environmental and social parameters potentially affected by the proposed facility." N.J.A.C. 7:26-2.9(a). The object is to promote a thorough evaluation of the proposed facility's effect upon surrounding water and soil quality, the impact on the local marine and mammal life and the surrounding ecosystem, and potential consequences of ground or surface discharges and emissions. N.J.A.C. 7:26-2.9(c)(3)(i)(ii)(iii).
Not all solid waste facilities are subject to these rigorous and stringent review requirements. Although the definitional sections of the Act are extremely broad and encompass every conceivable method of reducing and processing solid waste, (see N.J.S.A. 13:1E-3a, b, c, d, and h), N.J.S.A. 13:1E-4a authorizes the DEP to "exempt from the requirement of registration any class of solid waste collection or disposal facility or operation." While this section does not explicitly identify the procedural mechanism by which exemptions are to be granted or provide standards to guide the DEP in the exercise of its discretionary power, this statutory vacuum is filled by other provisions of the Act.
Initially, we need not dwell upon the question of the absence of statutory standards, because the constitutionality of the legislative delegation of power has neither been raised nor addressed by the parties. In any event, we are of the view that this statutory omission can be cured by drawing from the findings and declarations of policy expressed by the Legislature in N.J.S.A. 13:1E-2. See In re North Jersey Dist. Water *544 Supply Comm'n., 175 N.J. Super. 167, 204, 417 A.2d 1095 (App.Div. 1980), certif. den. 85 N.J. 460, 427 A.2d 559 (1980); In re Bernaducci, 85 N.J. Super. 152, 155, 204 A.2d 209 (App.Div. 1964), certif. den. 44 N.J. 402, 209 A.2d 140 (1965). Cf. Atlantic City Electric Co. v. Bardin, 145 N.J. Super. 438, 445, 368 A.2d 366 (App.Div. 1976). Because the subject involves esoteric engineering concepts and constantly changing technologies, administrative determinations respecting exemptions are not readily amenable to definite legislative standards. Given the legislative concerns expressed in N.J.S.A. 13:1E-2, however, we are convinced that the statutory objective was to authorize exemptions only with respect to technologies that either impose minimal environmental and public health risks or those that are pervasively regulated by other federal or state statutes.
As we noted, N.J.S.A. 13:1E-4a is silent with respect to the procedure by which the DEP is to grant exemptions. However, examination of the Act discloses two potential avenues for accomplishing the legislative objective. First, under N.J.S.A. 13:1E-6a(2) and N.J.S.A. 13:1E-9a, the DEP may adopt rules and regulations "hav[ing] the force and effect of law." Second, N.J.S.A. 13:1E-6a(3) requires the DEP to "[d]evelop, formulate, promulgate and review" biennially "a [s]tate wide solid waste management plan" that under N.J.S.A. 13:1E-46 is to include a "sludge management strategy."
Pursuant to N.J.S.A. 13:1E-6a(2) and N.J.S.A. 13:1E-9a, the DEP has adopted a comprehensive code of regulations respecting solid waste. N.J.A.C. 7:26-1.1 through -17.12). "Unless otherwise provided by rule or statute, [the regulations] govern the registration, operation, and closure maintenance of sanitary landfills and other solid and hazardous waste facilities...." N.J.A.C. 7:26-1.1(a). Although the regulations do not apply to certain identified solid waste technologies, see N.J.A.C. 7:26-1.1(a)1 through 6, "[s]pecifically not exempted are solid waste materials recovery facilities designed or operated for the purpose of separating mixed solid waste into useful secondary materials (including fuel and useable energy), or thermal destruction *545 facilities." (emphasis supplied). N.J.A.C. 7:26-1.1(a)(1). We have underscored the phrase "thermal destruction facilities" because HUCWSA contends that this reference expressly requires registration of the type of treatment plant to be constructed in this case.
However, the record does not support HUCWSA's argument. As we noted in our recital of the facts, the technology sought to be used in this case is "thermal reduction." The terms "thermal destruction" and "thermal reduction" are not synonymous. Under the regulations, a "[t]hermal destruction facility" refers to a "nonhazardous solid chemical waste facility which utilizes a thermal device to either burn waste or chemically decompose waste by heating it in an oxygen deficient atmosphere." N.J.A.C. 7:26-1.4 "Thermal reduction" refers to "a process of stabilizing and reducing the volume of residuals through exposure to high temperatures." Statewide Sludge Management Plan (1987) glossary 1 (SSMP). The environmental and economic impact of the two technologies differ. Specifically, thermal reduction has less of a deleterious impact on the environment. In contrast, thermal destruction poses a far greater potential for escape of pollutants into the atmosphere.
The regulations also contain specific sections dealing with the DEP's statutory power to grant exemptions. See N.J.A.C. 7:26-1.7. Specifically exempted are certain types of sanitary landfills, N.J.A.C. 7:26-1.7(d), on-site disposal of construction debris and vegetative waste, N.J.A.C. 7:26-1.7(e), vegetative waste composting facilities, N.J.A.C. 7:26-1.7(g), land application of non-hazardous solid waste receiving a temporary emergency or final New Jersey Pollutant Discharge Elimination System permit, N.J.A.C. 7:26-1.8, and leaf composting facilities, N.J.A.C. 7:26-1.12. Sludge-only thermal reduction facilities do not fall within any of the enumerated exemptions.
Nevertheless, sludge-only thermal reduction facilities are implicitly exempted from the solid waste permitting process by *546 the Statewide Sludge Management Plan, which under N.J.S.A. 13:1E-46 is a component of the Statewide Solid Waste Management Plan. An entire section of the SSMP, Part 4-IV, is devoted to this technology. The SSMP clearly states that facilities which involve codisposal of sludge with other forms of municipal solid waste require a solid waste permit from the DEP's Division of Solid Waste Management. Statewide Sludge Management Plan at 4-IV-18. The term "municipal solid waste" is defined as "residential, commercial and institutional solid waste generated within a community." N.J.A.C. 7:26-1.4. In common parlance, municipal solid waste is trash and garbage. Since the proposed facility in this case is designed to reduce sludge only and not "mixed solid waste," see N.J.A.C. 7:26-1.1(a)(1), this reference to the need to obtain a solid waste permit is not applicable. Instead, the SSMP states that a Treatment Works Approval, see N.J.A.C. 7:14A-12.1 through -12.26, and an air quality control permit, see N.J.A.C. 7:27-8, must be obtained prior to construction and operation of a sludge-only thermal reduction facility. Statewide Sludge Management Plan at 4-VII-20-21. To be sure, the SSMP does not expressly state that sludge-only thermal reduction facilities are exempt from the solid waste permitting process. However, by its express reference to other types of permits and approvals that must be obtained, the only reasonable conclusion to be drawn is that such facilities are excepted from the solid waste registration requirements.
Whatever confusion or ambiguity might otherwise exist in that respect is dispelled by the responses to comments contained in the SSMP. In response to a question concerning whether a solid waste facility registration must be obtained from the DEP's Division of Solid Waste Management, the SSMP states that "permitting requirements for incinerators will continue to be satisfied through issuance of air emission permits and [Treatment Works Approvals] once the facilities have *547 been included in the [District Sludge Management Plan].[2]Statewide Sludge Management Plan, Response to Comments, Part 4-IV, Thermal Reduction.
Beyond this, we note that the DEP has historically exempted sludge thermal reduction facilities from the solid waste registration requirements. We are obliged to accord substantial deference to the contemporaneous construction, long usage, and practical interpretation given to the Solid Waste Management Act by the DEP, the administrative agency charged with enforcement of the statutory scheme. See Last Chance Development v. Kean, 232 N.J. Super. 115, 128, 556 A.2d 796 (App. Div. 1989), aff'd, 119 N.J. 425, 575 A.2d 427 (1990); see also Smith v. Director, Div. of Taxation, 108 N.J. 19, 25-26, 527 A.2d 843 (1987); Malone v. Fender, 80 N.J. 129, 137, 402 A.2d 240 (1979); Service Armament Co. v. Hyland, 70 N.J. 550, 561, 362 A.2d 13 (1976); The Passaic Daily News v. Blair, 63 N.J. 474, 484, 308 A.2d 649 (1973); Pringle v. New Jersey Dep't. of Civil Service, 45 N.J. 329, 332-333, 212 A.2d 360 (1965). An agency's construction of a statute, and its powers under it, over a period of years without legislative interference will generally be granted great weight as evidence of its conformity with the legislative intent. Malone v. Fender, 80 N.J. at 137, 402 A.2d 240; Automatic Merchandising Council v. Glaser, 127 N.J. Super. 413, 420, 317 A.2d 734 (App.Div. 1974); Lavitz v. Civil Service Comm'n, 94 N.J. Super. 260, 266, 227 A.2d 722 (App. Div. 1967); Housing Auth. of Jersey City v. Dep't. of Civil Service, 87 N.J. Super. 146, 149, 208 A.2d 416 (App.Div. 1965).
We also acknowledge the "strong presumption of reasonableness that an appellate court must accord an administrative *548 agency's exercise of statutorily delegated responsibility." Matter of Pennsauken Solid Waste Mgt., 238 N.J. Super. 233, 251, 569 A.2d 826 (App.Div. 1990); see also New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-563, 384 A.2d 795 (1978). This presumption is particularly applicable here as the DEP has been delegated discretion in an esoteric area requiring special, technical expertise. Matter of Pennsauken Solid Waste Mgt., 238 N.J. Super. at 252, 569 A.2d 826; Newark v. Natural Resource Coun. Dep't. of Envtl. Prot., 82 N.J. 530, 540, 414 A.2d 1304 (1980), cert. den. 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980).
We are convinced that the SSMP exempts sludge-only thermal reduction facilities from the permitting requirement of the Solid Waste Management Act.

III.
We reject HUCWSA's argument that the DEP's exemption of sludge-only thermal reduction facilities from the solid waste permit requirement contravened the Administrative Procedure Act (APA) (N.J.S.A. 52:14B-1 through -15). While it would have been preferable had the exemption been adopted as a regulation, we are satisfied that its inclusion in the SSMP did not contravene the APA.
That the exemption appears in the SSMP rather than in the solid waste regulations is apparently a product of historical accident. On February 17, 1983 then Commissioner Robert E. Hughey issued Administrative Order No. 36, providing that "the functions and responsibilities of the Division of Waste Management concerning land treatment of sewage sludge [were to be] transferred to the Director of the Division of Water Resources...." Under the order, the Director of the Division of Water Resources was to be the "sole departmental official responsible for the duties" arising out of management of sludge. The order was consistent with the initial SWMP adopted by the DEP in 1982. Under that plan, sludge management *549 was excluded from the jurisdiction of the Division of Solid Waste. The SSMP was thus formulated by the Division of Water Resources while the solid waste regulations were prepared by the Division of Solid Waste.
There is no statutory requirement mandating that exemptions from solid waste registration be established by regulation. As we pointed out previously, N.J.S.A. 13:1E-4a is silent on the subject. Given the importance of the SWMP and SSMP under N.J.S.A. 13:1E-6a(3) and N.J.S.A. 13:1E-46, we are convinced that the DEP had the authority to grant solid waste permitting exemptions by including them in those central planning documents. While the exemptions have some of the characteristics of an agency rule, see Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 331-332, 478 A.2d 742 (1984), we find no violation of the APA.
We note that in adopting the SSMP the DEP complied with the essential requirements for rulemaking under the APA. Under the APA, an agency must provide notice before promulgating a rule, including publication in the New Jersey Register. N.J.S.A. 52:14B-4. The public must be granted an opportunity for comment. Ibid. Upon promulgating a rule, the agency must publish a document summarizing the comments and corresponding responses. Ibid.
Against this statutory backdrop, we observe that the proposed SSMP was published in the New Jersey Register. See 18 N.J.R. 2217(b). The notice announced three public hearings. Approximately 100 people appeared and testified at these hearings. In addition, the DEP received over 250 written comments. Responses were prepared and included in the SSMP. Final adoption of the SSMP was later published. 19 N.J.R. 2307. The only deviation from the APA's requirements is that the SSMP appeared in the section of the New Jersey Register entitled "Miscellaneous Notices," rather than in "Rule Proposals" and "Rule Adoptions." In the context of the facts here, we do not regard this deviation as material or meaningful. Cf. *550 American Cyanamid v. Dep't. of Envtl. Prot., 231 N.J. Super. 292, 309, 555 A.2d 684 (App.Div. 1989), certif. den. 117 N.J. 89, 563 A.2d 847 (1989).
In reaching our conclusion, we are mindful of the important public policies advanced by the safeguards established under the APA. Nevertheless, we also recognize that administrative agencies "must possess the ability to be flexible and responsive to changing conditions." Radiological Soc. v. New Jersey Dep't. of Health, 208 N.J. Super. 548, 560, 506 A.2d 755 (App. Div. 1986), certif. den. 104 N.J. 444, 517 A.2d 434 (1986). This flexibility "includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy." Texter v. Human Services Dep't., 88 N.J. 376, 385, 443 A.2d 178 (1982). While this discretion is not unlimited, we must defer to the choice made so long as the selection is responsive to the purpose of the legislation and the function of the agency.
Affirmed.
NOTES
[1] HUCWSA contends that the proposed thermal reduction facility constitutes a resource recovery facility, because one of the end products of the process is the generation of energy. We need not decide this issue. See NJPDES Permit No. NJ 005527, 216 N.J. Super. 1, 15 n. 8, 522 A.2d 1002 (App.Div. 1987), certif. den. 108 N.J. 185, 527 A.2d 1390 (1987). Even assuming that the proposed facility qualifies as a resource recovery facility, the question remains whether this type of sludge management technology has been exempted from the solid waste registration requirements. If, as Terminal Construction and the DEP contend, a sludge-only thermal reduction facility has been exempted the regulations dealing with permits for resource recovery facilities do not apply.
[2] At oral argument, HUCWSA raised for the first time the question whether the District Sludge Management Plan has been amended to authorize construction of the facility. The point has not been briefed by the parties and the record does not disclose whether appropriate amendments have been made. Under the circumstances, it would be inappropriate for us to address or resolve the question.